# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,
 *Plaintiff.*

v.

ANDRE DENNIS,
 *Defendant*.

No. 3:18-cr-328 (VAB)

## RULING ON MOTION TO SUPPRESS

On July 11, 2019, Andre Dennis ("Defendant") moved to suppress evidence of a handgun, cocaine, crack cocaine, fentanyl, a digital scale, and United States currency seized during a warrantless search of his residence by Connecticut state parole officers on November 29, 2018. Def.'s Mot. to Suppress, ECF No. 35 (Jul. 11, 2019) ("Def.'s Mot.").

On July 25, 2019, the United States of America (the "Government") opposed Mr. Dennis's suppression motion. Govt's Opp'n to Def.'s Mot., ECF No. 43 (July 25, 2019) ("Gov't Opp'n").

On August 22, 2019, the Court held an evidentiary hearing and heard oral argument on the motion. Minute Entry, ECF No. 44 (Aug. 22, 2019).

For the following reasons, the motion to suppress is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Findings of Fact[1]

On June 19, 2013, before the Connecticut Superior Court for the Judicial District of Waterbury, Mr. Dennis pleaded guilty to possession with intent to sell or dispense narcotics in violation of Connecticut General Statute 21a-277(a). Mr. Dennis was subsequently sentenced to

---

[1] The Court makes the following findings, unless expressly stated otherwise.

ten years of imprisonment, execution suspended, and began serving a five-year term of probation. *See* Conn. Judicial Branch Docket Sheet, annexed as Ex. 1 to Def.'s Mot.

On July 30, 2015, also before the Connecticut Superior Court for the Judicial District of Waterbury, Mr. Dennis pleaded guilty to violating his sentence of probation in violation of Connecticut General Statute § 53a-32. Mr. Dennis was subsequently sentenced to three years of imprisonment, to be followed by a five-year term of special parole.[2]

On May 22, 2017, Mr. Dennis was released from custody and began serving his term of special parole, which was scheduled to end on May 21, 2022. *See* Statement of Understanding and Agreement - Conditions of Parole (Ex. 2 to Def's Mot.), ECF No. 35-1 (Feb. 26, 2018) ("Parole Agrmt.").

On September 27, 2017, Mr. Dennis was remanded to state custody, allegedly "due to travelling out of the state without permission and visiting his domestic violence victim in North Carolina." Parole Violation Report (Ex. 3 to Def.'s Mot.), ECF No. 35-3 at 1-2 (Dec. 7, 2018) ("Report"). While in North Carolina, Mr. Dennis allegedly "physically assaulted the victim and a non-extraditable warrant was issued for the parolee for Domestic Violence and Larceny from the State of North Carolina." *Id.* at 2. The Board of Parole did not, however, make a finding as to the violation, and instead reinstated his special parole. *Id.*

---

[2] Special parole in Connecticut is a court-imposed sentence of supervision that follows a term of imprisonment. *See State v. Brown*, 310 Conn. 693, 695 n.1 (2013) ("Pursuant to § 54–124a (j)(1)–1 (19) of the Regulations of Connecticut State Agencies, 'special parole' means that period of supervision of an offender ordered by the court to follow a term of imprisonment, subject to conditions of parole set by the Board [of Pardons and Paroles or its chairperson], as provided in sections 53a–28 (b)(9) and 54–125e of the Connecticut General Statutes." (alterations omitted)). "In Connecticut, parole is administered by the Board of Pardons and Paroles ('the Board'). The Board is empowered to issue regulations for special parole, is given the authority to hold hearings to determine when special parole has been violated, and may commit a parole violator to prison for all or part of the balance of the term of his parole." *United States v. Julius*, 610 F.3d 60, 62 (2d Cir. 2010) (citing Conn. Gen. Stat. §§ 54–124a, 54–125e(b), (d) & (f)).

On February 26, 2018, Mr. Dennis signed a statement of understanding and agreement outlining the terms of his special parole. *See* Parole Agrmt. Among the terms of that agreement were a condition that Mr. Dennis "will submit to a search of my person, possessions, vehicle, residence, business or other area under my control at any time, announced or unannounced, with or without cause, by parole or its agent to verify my compliance with the conditions of my parole." *Id.* ¶ 5. In signing this agreement, Mr. Dennis affirmed that "[f]ailure to comply with these conditions may result in the revocation of parole, and, if applicable, the loss of good conduct credits earned while in prison," and that he fully understood that these conditions "shall apply to any term of Special Parole" for which he was sentenced to serve. *Id.* at 2. Mr. Dennis also initialed all of the individual conditions. *See id.* at 1.

Mr. Dennis's uncle, Deja Dennis, agreed to serve as Mr. Dennis's sponsor.[3] *See* Sponsor Questionnaire and Verification (Ex. A to Gov't Opp'n), ECF No. 43-1 at 2 (Apr. 9, 2018). On April 9, 2018, Deja Dennis signed a Sponsor Questionnaire and Verification Form. In that questionnaire, Deja Dennis stated that Mr. Dennis would sleep in his own bedroom on the first floor of his residence. *Id.* Deja Dennis also stated that his wife, Betty Dennis, lived in the house, an aunt lived on the second floor of the house, and other family members lived on the third floor of the house.[4] *Id.* In signing that form, Deja Dennis affirmed the following:

> By my signature below, I verify that I have answered the above questions truthfully and I further understand the offender is not permitted to live in a residence where firearms or other weapons are kept and I hereby certify that no firearms or other weapons are in this residence nor will any be brought into this residence as long as

---

[3] Based on this record, it is unclear whether Mr. Dennis was required to have a sponsor as a condition of his special parole. While his conditions state that he was required to live at a residence approved by his parole officer, they do not mention the need for a sponsor. *Compare* Agrmt. ¶ 1, *with United States v. Julius*, 577 F. Supp. 2d 588, 590 (D. Conn. 2008) ("The defendant's parole conditions required him to live with a sponsor in an approved residence, which his parole officer had a right to visit at any reasonable time." (emphasis omitted)), *vacated and remanded*, 610 F.3d 60 (2d Cir. 2010).

[4] The form is not clear as to whether these individuals are Mr. Dennis's aunt and sister or his uncle's aunt and sister.

> the offender is residing here. I further agree to notify the parole officer within 24 hours if the offender changes residence prior to discharging from supervision, and if necessary, I understand I am consenting to searches of my residence by Parole or its agent to ensure the offender's compliance with his/her conditions of supervision or in order to search for the offender.

*Id.*

Jennifer Desena, Mr. Dennis's parole officer, subsequently cited him twice for misconduct by his parole officer, Jennifer Desena. Report at 2.

On August 4, 2018, Mr. Dennis allegedly "left his residence at 12:45am and then returned home at 1:55am, violating his 9:00 PM GPS curfew." *Id.* Mr. Dennis allegedly "then left his residence once again at 2:09am and did not return home until the next day." *Id.* Mr. Dennis's GPS-monitored curfew was allegedly "extended due to his misconduct." *Id.*

On September 25, 2018, parole officers allegedly conducted "an unannounced home visit" at Mr. Dennis's residence. *Id.* While at the residence, officers allegedly found $600 in cash and a chemical agent used to cut cocaine on Mr. Dennis's person. *Id.* Mr. Dennis also allegedly tested positive for cocaine and fentanyl. *Id.* As a result, Mr. Dennis's level of supervision was allegedly increased to "Maximum," and he was allegedly referred to a substance abuse treatment program. *Id.*

While on special parole, Mr. Dennis allegedly never obtained full-time employment. *Id.* According to Parole Officer Desena, Mr. Dennis allegedly "always stated that he 'had too much money of his own to work.'" *Id.*

On November 29, 2018, Parole Officer Desena allegedly received an anonymous tip that Mr. Dennis possessed illegal narcotics and two firearms, *id.*, and she later testified that she elected to conduct a search because of this anonymous phone call, Tr., ECF No. 52 63:17-25 (Oct. 10, 2019). The caller asked for Parole Officer Desena by name, asked if Parole Officer

Desena was Mr. Dennis's parole officer, identified herself as his girlfriend, and said "[Mr. Dennis] needs to go to jail today on his birthday." *Id.* at 65:4-25. The caller told Parole Officer Desena that Mr. Dennis had struck her with a firearm, Mr. Dennis had two firearms under the couch in the living room, and that he was selling drugs. *Id.* at 66:1-20. The caller, however, refused to identify herself. *Id.* at 67:21-23. After consulting with her supervisor, Parole Officer Desena and a few other parole officers went to do a compliance check.

In response to the tip, Parole Officer Desena called Mr. Dennis and instructed him to report to the Waterbury Probation Office. Affidavit of Andre Dennis, dated July 10, 2019 ("Dennis Aff."), annexed as ex. 4 to Def.'s Mot., ECF No. 35-4, ¶ 2; Report at 2. Once Mr. Dennis arrived at the office, Parole Officer Desena arrested and handcuffed him. Dennis Aff. ¶¶ 3-4; Report at 2. Parole Officer Desena then put Mr. Dennis in the back seat of Parole Officer Byrnes's vehicle, and drove with Mr. Dennis to his residence, located at 41 Wyman Street, Waterbury, Connecticut, accompanied by Parole Officers Byrnes, Schaeffer, and Lettieri. Dennis Aff. ¶ 5; Report at 2.

Mr. Dennis alleges that, during the drive to his home, he "repeatedly instructed the officers in the car that they did not have [his] consent to search [his] apartment." Dennis Aff. ¶ 6.

Upon arriving at Mr. Dennis's home and accompanied by Parole Officers Schaeffer Lettieri, Parole Officer Desena allegedly knocked on the front door. Report at 2. According to Parole Officer Desena, Mr. Dennis's cousin, Mark A. Hayer, opened the door. Tr. 74:1-21 Parole Officer Desena allegedly introduced herself as Mr. Dennis's parole officer and asked if Mr. Dennis was home, to which Mr. Hayer responded no. *Id.* at 75:5-10. She then asked to come inside and he acquiesced. *Id.* at 74:10-12. She did not testify that she asked for Mr. Hayer's identification card to document his identity because Mr. Dennis's sponsor was not present.

5

Mr. Hayer, offers a slightly different account of the officers' entry into Mr. Dennis's apartment. Mr. Hayer testified that he heard a knock on the door, asked who it was, and "cracked [the door] to open." *Id.* at 139:23-25. They allegedly responded "It's parole," and as they stepped inside, a parole officer asked if they could come in. *Id.* Mr. Hayer said, "Y'all are already in." *Id.* at 140:1. He was asked to remain outside, was searched, and asked for identification, of which a picture was taken. *Id.* at 140:3-12. He testified that the parole officers never asked for permission to come into the residence, *id.* at 140:13-15, and that they walked in immediately after he had cracked the door open, *id.* at 140:13-20.

He recognized Parole Officer Desena and "observed at least four (4) other people in police uniforms." Affidavit of Mark A. Hayer, dated July 9, 2019 ("Hayer Aff."), annexed as Ex. 5 to Def.'s Mot., ECF No. 35-5, ¶¶ 4-5. Mr. Hayer claims that "one of the people dressed in a police uniform stated that they had a warrant to search the first floor apartment at 41 Wyman Street in Waterbury." *Id.* ¶ 6. After he informed them that he did not live in the apartment and provided his identification to the officers, Mr. Hayer claims the officers entered the home and began their search. *Id.* ¶¶ 8–9. Mr. Hayer further states that he was never asked for his consent to search the apartment, and that he did not provide such consent, as he did not live there." *Id.* ¶ 10.

After entering the residence, Parole Officer Desena immediately checked the couch for firearms or drugs, but found nothing. *Id.* at 75:17-24. The search continued and eventually a firearm, holster, and drugs were found on the back porch. *Id.* at 76:11-20. Parole Officer Desena found the firearm, holster, and drugs in a black plastic bag in a garbage can on the back porch. *Id.* at 76:23-77:9. Parole Officer Desena then called the Waterbury Police Department for assistance. *Id.* at 78-7:12. After the gun was processed by the police department's forensics team, Parole Officer Desena allegedly then located a plastic bag inside the garbage can containing

multiple plastic bags allegedly filled with drugs. Report at 2. The parole officers subsequently located additional drugs, digital scales, and United States currency in the apartment. *Id.*

In all, during the search, the parole officers seized the following: one black Smith and Wesson handgun, 7.6 grams of cocaine, 12 grams of crack cocaine, 45.2 grams of fentanyl, and a digital scale, all of which were recovered from a garbage can in the back door hallway of Mr. Dennis's first floor apartment; 4 grams of marijuana and a digital scale, both of which were found in the living room of the apartment; 70.7 grams of marijuana, which was found in the dresser in Mr. Dennis's bedroom; and $9,102 in United States currency, which was recovered from the ceiling tiles in Mr. Dennis's room. Def.'s Mot. at 2-3; Report at 2.

After the search was completed, Parole Officer Desena notified Parole Manager Kendra Herrick of the results of the search. Report at 2. Then she took Mr. Dennis to the Waterbury Police Department so that he could be remanded to custody. *Id.*

While at the police station, Mr. Dennis allegedly provided a voluntary statement to the police. *Id.* That statement reads as follows:

> My name is Andre Dennis, I am thirty eight years old and I am at the police department today because I am under arrest from drugs and a gun at my house which is [redacted]. Detective Schmaling read me my rights which I understood and signed a piece of paper saying I understood. I can read and write in English and the last grade of school I completed was eleventh grade at [redacted]. No threats or promises have been made to me.
>
> Today I was at my house when I got a call from my parole officer saying that there was problems with my GPS bracelet. I left and went to Parole to meet with my P.O. When I got there they told me they were doing a compliance check. They put me in a car and drove me to my house. Parole checked my house and told me that they found a gun. I told them that it was mine and I was brought to the police department, where I said that I would talk to Detective Schmaling. I told Detective Schmaling that on the back porch of my house there is a black garbage can. I told him that in the garbage can there is a black 9mm handgun with a holster. There is also drugs in the

> garbage can. There is about twenty five grams of raw heroin, one ball of coke and one ball of crack. By one ball I mean 3.5 grams of coke and 3.5 grams of crack. There was also about 1 ounce of marijuana in my bedroom in the top dresser drawer.
>
> Everything illegal in the house was mine and my uncle, aunt and sister do not know anything about the drugs or the gun and I don't want them to get in trouble for it.

Statement of Andre Dennis taken by Jeffrey Schmaling, dated Nov. 29, 2018, annexed as Ex. 7 to Def.'s Mot., ECF No. 35-7.

### B. Procedural Background

On December 19, 2018, a grand jury returned an indictment charging Mr. Dennis with: (1) possession with intent to distribute fentanyl, cocaine, and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (2) unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(2). Indictment, ECF No. 1 (Dec. 19, 2108).

On January 3, 2019, Mr. Dennis was arraigned before United States Magistrate Judge Robert A. Richardson. Minute Entry, ECF No. 10 (Jan. 3, 2019). Mr. Dennis entered a plea of not guilty on all counts. *Id.*

On July 11, 2019, Mr. Dennis moved to suppress all physical evidence seized during a search of his residence on November 29, 2018, Def.'s Mot., as well as post-search, post-*Miranda* admissions made by Mr. Dennis, Gov't Opp'n at 1.

On July 25, 2019, the Government opposed Mr. Dennis's motion to suppress. Gov't Opp'n.

On August 22, 2019, the Court held an evidentiary hearing on the motion. Minute Entry, ECF No. 44 (Aug. 22, 2019). A total of seven witnesses testified and seven exhibits were admitted into evidence.

After the evidentiary hearing concluded, the parties submitted post-hearing briefs. Defendant's Post-Hearing Memorandum of Law, ECF No. 53 (Oct. 17, 2019) ("Def.'s Post-Hrg. Mem."); Government's Memorandum in Opposition to Def.'s Post-Hrg. Mem., ECF No. 57 (Oct. 25, 2019) ("Gov't Post-Hrg. Mem.").

Jury selection is scheduled to begin on June 1, 2020. Order, ECF No. 55 (Oct. 24, 2019).

## II.  STANDARD OF REVIEW

Illegally obtained evidence is generally not admissible at a criminal trial under the exclusionary rule. *See, e.g., United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (citation omitted) (in the context of a Fourth Amendment violation); *United States v. Anderson*, 929 F.2d 96, 98–99, 102 (2d Cir. 1991) (in the context of the voluntariness of a confession under the Fifth Amendment); *see also Terry v. Ohio*, 392 U.S. 1, 12–13 (1968) (noting that the exclusionary rule maintains "judicial integrity" and "has been recognized as a principal mode of discouraging lawless police conduct" (citations omitted)).

Exclusion of evidence is not automatic, however; it is considered a "last resort, not [a] first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Mich.*, 547 U.S. 586, 591 (2006)); *see also id.* ("The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies"). A court will suppress evidence only when the "remedial objectives" of the exclusionary rule "are thought most efficaciously served—that is, where its deterrence benefits outweigh its substantial social costs . . . ." *Hudson*, 547 U.S. at 591; *see also Julius*, 610 F.3d at

9

66 ("Above all else, *Herring* makes plain that a search that is found to be violative of the Fourth Amendment does not trigger automatic application of the exclusionary rule. That is, application of the exclusionary rule is not a matter of right upon a finding that an improper search has taken place. Rather, 'the exclusionary rule is not an individual right and applies only where ... [it serves the purpose of] deterring Fourth Amendment violations in the future.'") (quoting *Herring*, 555 U.S. at 141).

On "a motion to suppress physical evidence, the burden of proof is initially on the defendant." *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005). "Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful." *Id.*; *see also United States v. Williams*, No. CR-06-0810 (CPS), 2007 WL 643051, at *3 (E.D.N.Y. Feb. 26, 2007) ("Having testified that he did not drop the bag of marijuana in view of the officers, the defendant has established a factual basis for his motion and shifted the burden to the government."); *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) ("On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." (quoting *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004), and collecting cases)). "The standard of proof on the party who carries the burden is a preponderance of the evidence." *Breckenridge*, 400 F. Supp. 2d at 437 (citations omitted).

### III. DISCUSSION

#### A. Mr. Dennis's Expectation of Privacy

"Fourth Amendment rights are personal, and may be enforced only by persons whose *own* protection under the Amendment has been violated." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997) (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)) (emphasis in original). "Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Massey*, 461 F.3d 77, 178 (2d Cir. 2006) (internal quotation marks omitted). In conducting this balancing test, "[c]ourts must examine the totality of the circumstances surrounding the search, which includes the Plaintiff's status as a parolee." *Rivera v. Madan*, No. 10-CIV-04136 (PGG), 2013 WL 4860116, at *4 (S.D.N.Y. Sept. 12, 2013); *see also Samson v. California*, 547 U.S. 843, 852 (2006) ("The extent and reach of these conditions [that parolees are subject to] clearly demonstrate that parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone.").

Because the Fourth Amendment balancing test requires a court to weigh the intrusion on an individual's privacy against the degree to which the intrusion is needed to promote "legitimate governmental interests," *see Massey*, 461 F.3d at 178, it is necessary to assess the state's "search regulations for parolees as they have been interpreted by state corrections officials and state courts" to determine whether a search of a parolee violated the Fourteenth Amendment, *United States v. Grimes*, 225 F.3d 254, 258-59 (2d Cir. 2000).

"To contest the validity of a search, a defendant must demonstrate that he *himself* exhibited an actual subjective expectation of privacy in the area searched, and that this

subjective expectation is one that society is willing to accept as reasonable." *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)) (emphasis in original). Thus, a defendant may not bring a motion to suppress if he or she does not establish a personally-held, reasonable expectation of privacy in the searched area. *See id.* ("A defendant lacks 'standing' in the Fourth Amendment context when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could ever be considered reasonable.").[5]

---

[5] For many years, courts used the framework of Fourth Amendment "standing" in making this threshold determination. In *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court indicated that such "standing" doctrine is not the preferred framework for these determinations. *See Carter*, 525 U.S. at 88 ("The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of 'standing' doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas*. In that case, we held that automobile passengers could not assert the protection of the Fourth Amendment against the seizure of incriminating evidence from a vehicle where they owned neither the vehicle nor the evidence. Central to our analysis was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.' Thus, we held that in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'") (quoting *Rakas*, 439 U.S. at 139–40, 140, 143–44 & n.12; citing *Smith*, 442 U.S. at 740–41).

But many courts—including the Second Circuit—have continued to use the term "standing" in this analysis. *See, e.g.*, *United States v. Hamilton*, 538 F.3d 162, 167–70 (2d Cir. 2008) (reviewing and rejecting district court's view that defendant lacked standing because he had no reasonable expectation of privacy); *Figueroa v. Mazza*, 825 F.3d 89, 110 (2d Cir. 2016) ("We have found no case denying Fourth Amendment standing on similar facts, and have found a number of cases finding Fourth Amendment standing on less convincing facts.") (collecting cases); *United States v. Russell*, 501 F. App'x 67, 70 (2d Cir. 2012) ("As to the search of the home of Russell's father, Russell lacks standing to challenge this search, as he did not establish a personal expectation of privacy there in the proceedings before the district court.") (citations omitted); *United States v. White*, No. 17 Cr. 611 (RWS), 2018 WL 4103490, at *8–9 (S.D.N.Y. Aug. 28, 2018) ("Here, White has failed to establish standing as required to bring this motion to suppress because neither he nor a person with personal knowledge has demonstrated by sworn evidence that White had any property or possessory interest in the Facebook account . . . . Even assuming standing, White has failed to show that the warrant was not supported by probable cause and that it failed to satisfy the particularity requirement.").

As one court has explained, this doctrine remains "useful as short-hand when discussing Fourth Amendment issues under the appropriate 'reasonable expectation of privacy' analysis." *United States v. Cody*, 434 F. Supp. 2d 157, 163 n.3 (S.D.N.Y. 2006); *see also, e.g.*, *United States v. Ashburn*, 76 F. Supp. 3d 401, 411 n.9 (E.D.N.Y. 2014) ("Nevertheless, the court finds the concept of 'standing' useful in distinguishing between the question of whether Laurent has a reasonable expectation of privacy with respect to cell phones subscribed to by his father and the analysis with respect to whether the Government's obtaining cumulative historical cell-site records constitutes a Fourth Amendment search." (citations omitted)).

It appears that many parties—including the Government—routinely continue to use the term "standing" in this manner. *See, e.g.*, *United States v. Bodnar*, No. 3:17-cr-157 (JBA), 2019 WL 582478, at *2 n.1 (D. Conn. Feb. 13, 2019) (explaining that, in light of the language in *Carter*, the court would analyze the government's standing under the "substantive 'reasonable expectation of privacy' framework which effectively replaced the Fourth Amendment 'standing' doctrine.").

(Continued . . .)

In *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court recognized that probationers subject to a probation search condition have a diminished expectation of privacy in their home, but stopped short of finding that this expectation is completely eliminated such that no individualized suspicion is required to conduct a search. *See Knights*, 534 U.S. at 120 n.6 ("We do not decide whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy . . . that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment.").

In *Samson v. California*, 547 U.S. 843 (2006), however, the Supreme Court held that in light of the "totality of the circumstances pertaining to petitioner's status as a parolee," "including the plain terms of the parole search condition," the parolee moving to suppress evidence "did not have an expectation of privacy that society would recognize as legitimate."[6] *Samson*, 547 U.S. at 852. In *Samson*, the parole search condition required a parolee to consent to a search or seizure "by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." *Id.* at 846. As a result, the Fourth Amendment permits a suspicion-less search of a parolee's residence.

---

Whether or not the term "standing" is used, the substantive threshold question is the same: whether the defendant had a legitimate expectation of privacy in the searched area that entitles him or her to some degree of Fourth Amendment protection.

[6] The Supreme Court did, however, slightly qualify its holding in *Samson*: "Because we find that the search at issue here is reasonable under our general Fourth Amendment approach, we need not reach the issue whether acceptance of the search condition constituted consent in the *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973), sense of a complete waiver of his Fourth Amendment rights . . . . [W]e decline to rest our holding today on the consent rationale." *Id.* at 852 n.3 (internal citation and quotation marks omitted). In other words, the parolee's condition of release requiring him to submit his residence to a search was sufficient to eviscerate any "legitimate" expectation of privacy he might have had, but declined to say it was so-diminished because he had actually consented to that diminishment.

13

The Court need not reach the issue, however, of whether the parole search condition wholly eliminated Mr. Dennis's expectation of privacy because "the scope of defendant's consent in this parole agreement appears narrower than—and factually distinct from—the scope of the parole agreement in *Samson*." *Watts*, 301 F. App'x at 42 n.2.

Here, the parole search condition Mr. Dennis assented to required him to "submit to a search of my person, possessions, vehicle, residence, business or other area under my control at any time, announced or unannounced, with or without cause, by parole or its agent to verify my compliance with the conditions of my parole." Parole Agrmt. ¶ 5. This condition, adopted by the Board of Pardons and Paroles in 2008, is part of Connecticut's standard conditions of parole. *See Julius*, 577 F. Supp. 2d at 590 n.2.

This condition, unlike the conditions in *Samson*, is silent as to whether a warrant would ever be required to conduct a search. In addition, unlike the parole search condition in *Samson*, Connecticut's parole search condition does not appear to be specifically enshrined in state law.[7] *See Samson*, 547 U.S. at 846 (citing Cal. Penal Code Ann. § 3067(a)).

In light of these differences, Mr. Dennis had at least some minimal expectation of privacy, even though it is plainly one that is "significantly diminished" by the parole search condition when compared to that enjoyed by a non-parolee. That minimal expectation of privacy

---

[7] It also does not appear that either the Second Circuit or the Connecticut Supreme Court has had the opportunity to evaluate the extent to which Connecticut's parole search condition diminishes a parolee's reasonable expectation of privacy. In *Julius*, the most recent Second Circuit case concerning a Connecticut parolee's expectation of privacy, the defendant was not subject to a parole search condition. *See Julius*, 610 F.3d at 62 ("Julius stresses that the conditions of his special parole did not include consent to searches by parole officers. In fact, as the district court noted, the Board did not make consent to search a standard condition of parole until May 2008." (citation omitted)). And in *State v. Jacques*, 332 Conn. 271 (2019), the Connecticut Supreme Court was presented with an incomplete record with respect to the defendant's parole conditions. *See Jacques*, 332 Conn. at 299-306 (Kahn, J., concurring) (discussing standards set out in *Samson* but explaining that because the trial court did not make findings as to the specific conditions of defendant's release, and because the State did not introduce evidence of those conditions into the record, the court could not determine whether his expectation of privacy had been sufficiently diminished to authorize the searches at issue and render trial court's error in denying motion to suppress evidence harmless).

14

is sufficient to allow him to move to suppress the evidence that was seized—i.e., to give him "standing" to move to suppress.

### B. Reasonableness of Warrantless Search

"Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848.

Anonymous tips are examined under a totality of the circumstances approach. *Navarette v. California*, 572 U.S. 393, 397 (2014). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* (internal quotation marks and citations omitted). "When the informant's tip, standing alone, lacks sufficient indicia of reliability because it does not do enough to establish the informant's basis of knowledge and veracity, it may still support a finding of reasonable suspicion if sufficiently corroborated through independent police investigation." *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (citing *Draper v. United States*, 358 U.S. 507 (1959)).

"Knowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person" is involved in illegal activity. *Florida v. J.L.*, 529 U.S. 266, 271 (2000); *see also Alabama v. White*, 496 U.S. 325, 332 (1990) (in considering reliability, it is important to assess a "caller's ability to predict respondent's *future behavior* because it demonstrated inside information—a special familiarity with respondent's affairs" (emphasis in original)). "Where the informant is completely anonymous . . . a significant amount of corroboration will be required." *Elmore*, 482 F.3d at 181.

15

Mr. Dennis argues that the search of his residence was not reasonable because "the anonymous tip in this case did not provide any predictive information that the [parole] officer could have used to pursue corroboration," "[n]or was there any independent 'indicia of reliability' as to the substance of the tip." Def.'s Mot. at 7.

The Court disagrees.

As Parole Officer Desena testified, she received a tip sufficiently reliable because it provided her with information corroborating that the tipster had a relationship with Mr. Dennis. Parole Officer Desena also had three other reasons to find the allegations in the tip credible: (1) Mr. Dennis's repeated statements that he had too much of his own money to work; (2) the results of her prior search of Mr. Dennis, which resulted in both her discovery of a chemical agent used to cut cocaine on his person and Mr. Dennis testing positive for cocaine and fentanyl; and (3) Mr. Dennis's recent violations of his curfew in the middle of the night.

"Under the totality of circumstances approach mandated by *Gates*, even a completely anonymous tip could support a finding of probable cause with a sufficient degree of corroboration." *Elmore*, 482 F.3d at 180. But here, it is not merely the anonymous tip, and the credibility given it by Parole Officer Desena that provides the reasonable suspicion necessary to justify this search; there was some indicia of reliability of the anonymous tip, given the caller's knowledge both of Mr. Dennis's birthday and that he not only had a parole officer, but knew the parole officer's name. *See* Transcript, ECF No. 52, 65:4-25.

The totality of circumstances also includes Parole Officer Desena's knowledge of and familiarity with Mr. Dennis that gave her reasonable suspicion to believe that criminal activity may have occurred. *See Navarette v.* California, 572 U.S. 393, 397 (2014) ("The reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information

16

possessed by police and its degree of reliability.'" (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990))). In other words, if Parole Officer Desena had no prior contact or knowledge about Mr. Dennis before the anonymous call, then this case would be a closer call. But given Parole Officer Desena's ongoing knowledge about Mr. Dennis and her suspicions about ongoing criminal activity, as well as the information provided by the anonymous caller, there was reasonable suspicion in this case.

Based on the evidence in the record, the state's interest in quickly responding to the tip was extremely high, while Mr. Dennis's expectation of privacy was extremely low, in light of the parole search condition.[8] Thus, the State's legitimate interest in quickly responding to a credible allegation of Mr. Dennis's criminal misconduct in violation of his parole conditions by conducting a compliance search, outweighed Mr. Dennis's minimal expectation of privacy.

Accordingly, the motion to suppress will be denied.

## IV. CONCLUSION

For the reasons discussed above, the motion to suppress is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of March, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN

---

[8] Mr. Dennis alternatively argues that he withdrew any consent to search his residence when he repeatedly stated, while under arrest and in the back seat of PO Byrnes's vehicle, that the parole officers did not have his permission to search. Def.'s Mot. at 8–10. But that argument misconstrues the impact of the parole search condition on Mr. Dennis's legitimate expectation of privacy. While Mr. Dennis was required to affirm that he understood his conditions of parole and that he agreed to comply with them, the conditions of release are an order of the Board of Pardons and Paroles. As in *Samson*, the parole search condition so diminishes Mr. Dennis's legitimate expectation not because he consented to it in the *Schneckloth* sense, but because it was clearly expressed to him and he was unambiguously aware of it. *See Samson*, 547 U.S. at 852 n.3 ("[W]e decline to rest our holding today on the consent rationale"). Accordingly, as there was no "consent" for Mr. Dennis to withdraw, the Court need not reach the question of whether a parolee can withdraw such consent.

Similarly, the Court need not determine whether, as the Government suggests, the relevant consent in this situation is that of Mr. Dennis's uncle/sponsor, nor make any determination as to whether Mr. Dennis's status as an objecting co-tenant overrode the consent of his sponsor. *See* Gov't Opp'n at 9; Def.'s Mot. at 10–12 (citing *Georgia v. Randolph*, 547 U.S. 103 (2006)).

                                          UNITED STATES DISTRICT JUDGE